

Exhibits A-C

# isclosure shocks officials

## Sensitive children's services records found in truth

CHILDREN'S SERVICES

By BILL McKINNEY
News Staff Reporter

[Part I of a 2-part series]

# OCY expenses add to county's legal bills

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and I am convinced we would have won if it had gone forward."

Conley withdrew her claim because the proceeding was "not in her best interest," according to a letter on file with the Civil Service Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Conley case is the second large expenditure the Schenker administration has paid over OCY personnel issues in the past year.

In August, in an agreement the administration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dows.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to resign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in court against her supervisor at OCY, whom Conley said altered court records. The Schenker administration has disputed that claim.

By Leone said the county's four assistant solicitors is $31,000 a year as well as the $25,000 each have an hourly individual bill rate of the overall case expenses.

But Conley said the bill is not great rate said he is satisfied with the work of MacDonald, Illig, Jones & Britton — Schenker administration for the past five years ago over a whistleblower...

In her Civil Service appeal, Conley said county officials told her the day of her resignation that she had violated OCY rules by using her office e-mail to disclose the telephone number of an OCY client to the client's former caseworker Conley said she did nothing wrong.

The Schenker administration disagrees. The county's person-

nel director, Peter Callan, said in an October memo that Conley disclosed a confidential OCY court order "with the intent of alerting" the pregnant mother who was the subject of it.

Onorato, in an interview last week, said the county has "mounted a vigorous defense" against Conley because of her "egregious breach of confiden-

tiality" regarding the court order. He said the county does not want Conley to return to OCY.

"In essence," Onorato said of the $56,371 legal bill, "the fee was being spent in the defense of children."

*ED PALATTELLA can be reached at 870-1813 or by e-mail.*

---

# County settles negligence suit

Erie County has settled a lawsuit with an Erie family that charged the county's Office of Children and Youth was negligent concerning incidents of alleged sexual abuse against an adopted girl.

Under the settlement, the county will pay the girl and her adopted family $15,000.

The suit was filed in 1989 by a couple identified only as A.P. and P.F. and for their adopted daughter, J.F.

The girl had been placed in the custody of Children and Youth in 1984 and was placed with foster parents, who eventually adopted her.

The couple claimed that J.F. was required to have supervised and unsupervised visits with her natural mother. During such visits, the couple alleged, the girl suffered physical and sexual abuse by the natural mother, the mother's boyfriend and the girl's brother.

The couple claimed in the suit that the county agency had a duty to pro-

## Couple said county agency responsible for protecting child during parental visits.

tect the child from such abuse during visitations and should have recognized problems existed.

John Petulla, director of the Office of Children and Youth, said the settlement is not an acknowledgment that the agency erred in this case, but a sign that the agency agrees the parents need help in dealing with the child's special needs.

The couple filed suit after county officials revised a request for a state subsidy to help care for the child, which was needed for the child's special needs as a result of the similar molestations on the couple's

anything more than she did to which they believed they were entitled.

"These are very special people,"

Bruno said. "They weren't out for anything more than what this child was entitled to."

Eventually, the county did support the family's subsidy request, and they were awarded $16,000 in back payments as well as a continuing monthly check.

The $15,000 settlement, with the county, approved last week by Erie County Judge Roger Fischer, provides for legal, medical and other expenses incurred by the family.

Included in the expenses cited by the family is the cost of constructing a separate bathroom for J.F. for the needs of the child and the security of the couple's other children. Bruno said the separate bathroom was needed for the child's privacy and to prevent her from trying to act out other molestations on the couple's...

He said the child and the family have been through a lot, but the girl is getting better.

# aw firm: OCY expenses add to county's legal b

tinued from 1A

...ell said John Onorato, the year, and the county's solicitor for the Schenker administration.

e county has a staff of in-house lawyers on retainer. The nker administration hired onald, Illig to handle Conley's ase because of the firm's ex- ...ranging from $62 to $71.75 an hour, according to OCY records. Those lawyers typically deal with child-welfare issues for OCY, which handles cases of abused and neglected children.

3 unique circumstances of onley case, Onorato said orato said he and some of 's other in-house rs, including those at OCY involved in the personnel y against Conley and were be witnesses in a case over y's ouster. Defending the y in a case while being and almost impossible," o said. He said he was sub- ...ed to testify at the hearing. county's liability insur-...ge unless Conley were to...

The accuracy of the bill is not in dispute. Onorato said he is satisfied with the work of MacDon-ald, Illig, which the Schenker administration three years ago hired to negotiate the county's la-bor contracts. Taft has been the lead lawyer on those cases.

Taft said he aggressively pur-sued the Conley case because, at the time, Conley was threatening to take action against the coun-ty before the Civil Service com-mission and through a union grievance.

solicitor's staff," Leone said.

Onorato's retainer is $31,000 a year and the county's four as-sistant solicitors each have an-nual retainers of $25,000, ac-cording to county records. OCY has a full-time solicitor paid a salary of $71,620 a year as well as three other lawyers on retainers...

lig charged the county at a rate of $175 to $165 an hour in the Con-ley case, according to the bill. Taft worked 163 hours at an hourly rate of $175 for an individual bill of $28,525. The rest of the overall bill covered the work of the oth-er lawyers and expenses.

Conley, 43, had worked for the county for 13 years, including the past four years at OCY, when she resigned Sept. 10.

Conley claimed the Schenker administration forced her to re-sign to get back at her for being a whistleblower. Conley's ouster came about a month and a half after she testified in court against her supervisor at OCY, whom Conley said altered court records. The Schenker adminis-tration has disputed that claim.

"We were ready to go," he said of the Civil Service case. "We were ready to win the case and I am convinced we would have won it if had gone forward."

Conley withdrew her claim be-cause the proceeding was "not in her best interest," according to a letter on file with the Civil Ser-vice Commission. Conley last week said her lawyers have told her not to comment on her case.

The $56,371 spent on the Con-ley case is the second large ex-penditure the Schenker admin-istration has paid over OCY per-sonnel issues in the past year. In August, in an agreement the ad-ministration initially tried to keep secret, the county paid a $100,000 settlement to fired OCY caseworker David A. Dows.

In her Civil Service appeal, Conley said county officials told her the day of her resignation disclosed a confidential OCY court order "with the intent of alerting" the pregnant mother who was the subject of it.

Onorato, in an interview last week, said the county has "mounted a vigorous defense against Conley because of her "egregious breach of confiden-

nel director, Peter Callan, said in an October memo that Conley that she had violated OCY rules by using her office e-mail to dis-close the telephone number of an OCY client to the client's former caseworker. Conley said she did nothing wrong.

The Schenker administration disagrees. The county's person-

tiality" regarding it.
He said the county expects Conley to return to court to dis-pute the $56,371 legal bill.
"In essence," O... the $56,371 legal bill being spent in the children."

ED PALATELLA reached at 870-1813

## County settles negligence

Erie Co. ___ Children + Youth Services [handwritten annotation]

Erie County has settled a lawsuit with an Erie family that charged the county's Office of Children and Youth was negligent concerning in-cidents of alleged sexual abuse against an adopted girl.

Under the settlement, the county will pay the girl and her adopted family $15,000.

The suit was filed in 1989 by a cou-ple identified only as R.F. and P.F., and for their adopted daughter J.F.

The girl had been placed in the custody of Children and Youth in 1984 and was placed with foster par-ents, who eventually adopted her.

The couple claimed that J.F. was required to have supervised and un-supervised visits with her natural mother. During such visits, the cou-ple alleged, the girl suffered physi-cal and sexual abuse by the natural mother, the mother's boyfriend and the girl's brother.

The couple claimed in its suit that the county agency had a duty to pro-tect the child from such abuse dur-

### Couple said county agency responsible for protecting child during parental visits.

ing visitations and should have rec-ognized problems existed.

John Pettula, director of the Office of Children and Youth, said the set-tlement is not an acknowledgement that the agency erred in this case, but a sign that the agency agrees the parents need help in dealing with the child's special needs.

The couple filed suit after county officials refused a request for a state subsidy to help care for the child's special needs as a result of the abuse. Their lawyer, James J. Bru-no, said the couple never sought anything more than the aid to which they believed they were entitled.

"These are very special people,"

Bruno s...
anything...
was enti...

Event...
they wer...
the fami...
payment...
monthly...

The $...
county, ...
County ...
vides for...
expense...
Includ...
the fami...
a separa...
needs of...
said the ...
the coup...
needed f...
prevent...
similar n...
other chi...
He sai...
have bee...
is getting

HSLDA's E-lert Service:

SIGN UP TODAY





BLUE RIDGE HOME EDUCATION CONF
April 16, 2005
Winchester, Virginia



# Tennessee

HOME | LAWS | ORGANIZATIONS | CASES
| LEGISLATION | HEADLINES



April 10, 2002

## *Horn v. Brown*
## Civil rights violated through wrongful arrest

**Filed:** March 1, 2001, U.S. District Court at Jackson.

**Nature of Case:** This civil rights lawsuit for violation of the right to direct the education of one's child and for false arrest arises out of the criminal prosecution of the mother of a five-year-old. The child was not enrolled in public school, but the school official was told by the child's grandmother that the mother was planning to home school and that the child "should be in school." The attendance officer filed the criminal complaint after speaking with Mrs. Horn and learning that she was, in fact, planning to home school. The official admits knowing that the child was not yet compulsory attendance age when he filed. Mrs. Horn was arrested, but the criminal case against her was dismissed upon HSLDA's notice of representation. On March 1, 2001, HSLDA filed a lawsuit on behalf of Mrs. Horn for violation of her civil rights.

**Status:** On April 4, 2002, the parties agreed to a settlement.

**Last Updated:** April 10, 2002.

© Site Copyright 1996-2005 Home School Legal Defense Association
P.O. Box 3000 · Purcellville, VA 20134-9000 · Phone: (540) 338-5600 · Fax: (540) 338-2733 ·
E-mail: info@hslda.org
HOME | SEARCH | FEEDBACK | PRIVACY POLICY | ADVERTISING

Supported by the



COMMONWEALTH OF PENNSYLVANIA
DEPARTMENT OF PUBLIC WELFARE
HARRISBURG, PENNSYLVANIA  17120

**OFFICE OF
CHILDREN,  YOUTH & FAMILIES**

Mailing Date
February 21, 2003

**CHILDLINE & ABUSE REGISTRY
DEPARTMENT OF PUBLIC WELFARE
HILLCREST, 2ND FLOOR
P.O. BOX 2675
HARRISBURG, PA 17105-2675
TELEPHONE NO.  (717)  783-1964**

VICTORIA BIBBS
1725 W 14TH ST
ERIE  PA  16505

Child :      **CHARLES BIBBS**
Report No :  **250011006**
Agency:      **ERIE**

DEAR  MS. BIBBS :

The above named child was reported as a victim of suspected child or student abuse.

The agency listed above has investigated the report and determined it was Unfounded or Unfounded for School Employee because of one of the following : (1) the incident did not occur, (2) the injury was not of a serious nature, or (3) substantial evidence was not found.

The Child Protective Service Law states that unfounded reports must be retained one year from the date the report was made.  This is to notify you that the above listed report has been expunged by this office.

We are required to inform you that this action has been taken because your name was listed on the report as the perpetrator of child abuse or student abuse.  Within 120 days after the year has passed,  it will be expunged by the investigating agency.  However,  if the investigation reveals that the child and family need social services provided or arranged by the investigating agency,  the records will be retained by them.

If you have questions concerning the report,  you may contact the investigating agency at  (814) 451-6600.

*Issued by :* ChildLine & Abuse Registry



# CHILD ABUSE PROBES

N-3-30-78

he "control questions" and he "did you questions" central to the charge.

He said the control questions were questions that ideally should not have elicited a response but, in her case, they said. The test proved her neither guilty nor innocent.

Carl Triola, director of Children's Services, said Roger's accusation that he had been instructed not to inform police differed from what he (Triola) had been told by the current caseworker involved.

He said the first caseworker for Roger's children is no longer with the agency. Triola said he did have reservations about one aspect in the handling of the case.

Regarding the court order, Roger to send the children weekend visits, Triola said, the caseworker should have told the judge directly about

## TUCKER

...ditional cont Cur... he strengths she can to

our investigation and not assumed that the attorney (Roger's) would tell him."

He said the caseworker said she had advised the attorney to tell the judge but Triola said she should not have assumed he would.

"She should have told the judge herself and left it up to the court to decide if the visits were safe."

Mary said she feels the children should be "in a foster home until this abuse case is resolved since Roger is living with another woman."

"I told the caseworker that several times but all she said was that she didn't think it was necessary. That the children were in a situation similar to the one they had been in when Roger and I were living together."

Roger and Mary were never married, and the children are now living with their father and another woman whom Roger said is referred to as "mother" by the children, at his instruction.

The NEWS also spoke with Roger's legal wife, Judy, who has custody of a child she had

while married to Roger.

She also said she had never been contacted by Children's Services.

"I went to them after these charges came out in the newspaper," she said. "I read them the riot act. A supervisor there said he'd have a caseworker contact me.

"Three weeks went by and nothing. I called and started yelling again. The supervisor said he'd forgotten to give the caseworker the message. She called the next day."

Roger's wife said she is prepared to testify in court on behalf of Mary even though Mary had lived with her husband for years.

"I really want to find out what kind of investigation Children's Services did on this case," she said angrily. "They are something else."

(To be continued)



## FLORIDA?
### SEE PAGE 10B

---

ERIE CITY AND COUNTY LIBRA
ERIE, PENNSYLVANIA 16507

*Children Youth*
*Erie Co. Welfare Services  Orlando calls for*

# Triola: Security breac

By JEFF PINSKI
NEWS Staff Reporter

Erie County Children's Services Director Carl Triola said Friday the "security breach" that allowed confidential documents to be accessed highly sensitive agency papers in a proper... suitcases out of ... that had been investigating something that ...... to run in 10 years of daily work.

Meanwhile, State Senator Quentin Orlando of Erie called for a thorough appraisal of the County's Children's Services' operation,

one by the state and the other by the county.

The Morning News revealed Friday that during a 12-month investigation of Children's Services, reports about given highly sensitive agency papers that had been obtained by a citizen from a trash bin outside the Community Services Building at 2nd and Cherry.

The Morning News asked for meeting Thursday with County Executive Russell "Robbie" Robison, Juvenile Court Judge Fred Anthony,

and Sen. Orlando. NEWS representatives met with the three men in Robison's office and hashed over the confidential documents.

Robison said Children's Services' disposal method would have to "stop dead in its tracks right now." He ordered the agency to immediately remove documents that were in the dumpster and to insure that no more such papers were tossed into the files were carried out Thursday evening.

The Pennsylvania Child Protective Services Law (Act 124) clearly spells out that such sensitive papers are to be destroyed.

"I must assume complete responsibility for this," Triola said Friday. "I assumed that burned as required by the law. I should have followed up on it, but didn't, and I may job in jeopardy, because of this, it's only because it was my fault."

Triola said, "This is the first

ERIE, PA., TIMES-NEWS, Saturday, April 1, 1978

### ...alls for 2-pronged probe

# ...reach 'most devastating'

...sylvania Child Pro-
...ces Law (Act 124)
...k out that such
...ern are to be de-
...

...aging complete
... for him, Triola
... complain that
...re really being
...uired by the law.
... followed up on
... and leave job is
... because of this
...use it was my
...

..."This is the

most devastating thing that's
happened to me in 16 years of
social work. I've always tried
to champion confidentiality in
our cases and would stand be-
hind our workers 100 percent."

... he said, "an in-
cinerator was installed in the
basement of the building when
it was constructed specifically
for destroying confidential ma-
terial.

...again, why else would
you want to put an in-
cinerator in a small building
like this? I just naturally as-

sumed it was being burned."

"According to Triola, the
dumpster has been in use at
the county building for about
two years. He said it was pos-
sible the information has been
dumped there for the entire
two years."

"I have no bone to pick with
the newspaper on this because
I probably never would have
learned of this without the
help of the newspaper."

When legislators drafted Act
124, they provided that any
breach of confidentiality was

to be the subject of "legisla-
tive oversight," that a legisla-
tive review rather than a re-
view by the Department of
Public Welfare would be
called for.

"I'll begin proceedings in
the Senate to have an over-
view conducted by the state,"
Sen. Orlando said Friday.
"But this should be accom-
panied by an investigation by
the new county government
into the operation of Children's
Services. There is simply no
reason to do this twice when it
can be done together and at

the same time."

Sen. Orlando said he will in-
troduce the required resolution
before the Senate on Monday.
County officials will also be-
gin looking a shredding ma-
chine on Monday to deter-
mine if one should be pur-
chased to destroy the docu-
ments in the future.

"I think we have to weigh
the costs here and determine
whether the incinerator or the
shredder should be used,"
Triola said. "We should use
whatever is economically fea-
sible for the county."